Plaintiff brought this suit against the Tri-State Transit Company and its insurance carrier, the Hartford Accident 
Indemnity Company, and joined in the suit the Herrin Transportation Company and its insurance carrier, the Travelers Indemnity Company, so that the two principal defendants are the Tri-State Transit Company (hereafter called the Bus Company) and the Herrin Transportation Company (hereafter called the Herrin Company). There is no question of the liability of the two insurance companies if their respective assureds are liable.
Plaintiff claims damages in the sum of $28,725 for personal injuries, loss of time, permanent disability, medical expenses, etc. He was injured when a Tri-State bus on which he was a passenger ran into a van or freight truck of the Herrin Company backed across the paved highway just inside the limits of DeRidder, about 4 o'clock a.m., August 1, 1943. The bus was going west, and the front part of the bus struck the freight van almost broadside injuring plaintiff and several other passengers on the bus, the bus driver being killed in the accident. There are only two questions presented on the appeal: First, was either or both the Bus Company and the Herrin Company responsible for the accident, and second, the quantum of damages.
It is admitted that plaintiff was a paid passenger on the bus and as between him and the Bus Company, it was necessary for the latter to show that it was free from negligence, plaintiff having shown that he was injured while riding as a passenger.
In fact, neither defendant contends that plaintiff is not entitled to some damage, and the principal controversy revolves around the contention between the Bus Company and the Herrin Company each trying to place the blame for the accident on the other, the only point on which these two defendants agree is with reference to the amount of damages, each contending that the amount awarded is excessive.
The trial court rendered judgment in favor of plaintiff against both the Bus Company and the Herrin Company (and against their insurance carriers), in solido, for the sum of $13,111, and all defendants appealed. Plaintiff answered the appeal and asked that the award be increased to the sum of $22,642.25.
[1-3] Briefly, the negligence charged to the bus driver is that he was driving at an excessive speed, was not keeping a proper lookout and did not have the bus under control. The negligence charged to the employee of the Herrin Company was that he drove and placed the large freight van across the highway, blocking the highway, at night, without any lights, flares or other warnings to the traveling public. It is charged that the independent negligence of each defendant contributed to the accident. The Bus Company contends that the sole and proximate cause of the accident was the negligence of the driver of the Herrin truck in backing it into the highway in front of the approaching bus when the lights of the bus were or should have been in plain view. The Herrin Company contends that the proximate cause of the accident was the excessive speed of the bus, the failure of the driver to keep a proper lookout and stop the bus when he saw or should have seen that the van was across the highway. It is contended by the Herrin Company that if its employee was guilty of any negligence such negligence was slight and not the proximate cause of the accident. The Herrin Company alleges and attempted to show that, conceding that its employee was guilty of some negligence, the driver of the bus had the last clear chance to avoid the accident by stopping the bus after he saw or should have seen the van across the highway. Objection was made to evidence on this defense on the ground that one codefendant in a tort action cannot plead the last clear chance against another co-defendant, which objection was sustained by authority of the ruling in the case of Shield v. Johnson Son Company, Ltd., 132 La. 773, 61 So. 787, 47 L.R.A., N.S., 1080.
We think the ruling was correct. It is well settled that where the negligence of two or more persons combines to cause an injury to a third person, all of the persons whose negligence concurred in and contributed to the injury are liable in solido, and the plaintiff in such a case is not concerned with the question of the degrees of negligence as between the co-defendants, or their respective rights inter sese. On this point, what we said in the case of Falgout v. Younger et al., 192 So. 706, 711, is appropriate to this case: "If the negligence of the drivers of the two trucks in this case combined to bring about *Page 683 
the accident, a third person, without fault, as plaintiff was in this case, has a right to collect his full damage from any or all the defendants. We are forced to the conclusion that the combined negligence of the drivers of both trucks brought about the accident — that of Hebert in creating an unlawful obstruction in the road thereby blocking traffic without giving the proper signals, and that of Bourg in driving into this hazard at too fast a speed and in failing to have his car under control. Where a defendant is responsible for one of two or more proximate causes of an injury, he cannot escape liability because a third person is responsible for a concurrent proximate cause."
[4] A careful review of the record in the present case convinces us that the injury which the plaintiff suffered was caused by the combined negligence of the driver of the bus and that of the driver of the freight van, and that the negligence of each was a proximate and contributing cause of the injury. It is unnecessary for us to undertake the difficult task of parcelling out to each driver the degree or extent to which his negligence contributed to the accident as the doctrine of comparative negligence does not prevail in this State.
[5] We have no hesitancy in reaching the conclusion that the Bus Company has failed to discharge its duty of proving that its driver was free from negligence. On the contrary, the record clearly shows that the driver of the bus was guilty of negligence in several respects. He was driving at a rather excessive rate of speed. The speed of the bus is estimated all the way from 50'to 65 miles per hour. The Bus Company claims that the governor on the bus kept the speed down to not over 47 miles per hour. Several passengers on the bus testified that the driver had difficulty in holding the bus on the road for some time prior to the accident; that he appeared to be sleepy and tired. About 300 feet east of the point of the impact there is a rise or crest of a hill, and as the bus driver was traversing the small decline or hollow just east of this rise, it is probable that he could not see over the crest of the hill and down the slight incline to the point where the freight van was backed, or being backed, across the road, at least until the lights of the bus could be focused downward after passing the crest of the hill. Be that as it may, if the driver could not see the road clear ahead of him for a reasonable distance, it was his duty to slow down his bus so as to be able to meet any emergency which might arise making it necessary for him to come to a stop.
Conceding that the bus driver did not or could not see the van until he reached the crest of the hill, he had ample time in which to stop the bus before crashing into the van had he been keeping a proper lookout and had he been going at a proper speed. It is shown that the bus could have been stopped within much less space than the distance from the crest of the hill to the point of impact, even though it was going 50 or 60 miles per hour. And, of course, if it was not going over 47 miles per hour as contended by the Bus Company, there was no reason why the bus driver should not have seen the situation ahead of him in ample time to stop the bus, conceding that the van began backing across the highway about the time the bus reached the crest of the hill. The fact that the bus was going at an excessive speed is indicated by the severity of the blow against the side of the van. The heavy freight van was knocked several feet (estimated from four or five feet to as much as 24 feet) west on the pavement, turning over the van on its left side. The front of the bus was also demolished. The evidence of skid marks made by the wheels of the bus is not very satisfactory, however, the decided preponderance of the evidence indicates that the brakes of the bus were not applied, if applied at all, until the bus was within a few feet of the van. If it is conceded that the freight truck did not begin to back up until the bus was within 50 or 100 feet of it, as contended by the Bus Company, there was little effort made by the bus driver to meet this hazard. But, as we shall now endeavor to show, the van must have begun backing up about the time, or before, the bus reached the crest of the hill some 300 feet away.
The Herrin Company has a warehouse north of the highway and some 50 feet from the paved road. At the time of the accident, the space between the warehouse and the highway was graveled, and the van in question was backed up across the highway in order for another freight truck to get to the warehouse. The freight truck was from 30 to 35 feet in overall length. As the driver of the truck backed up, he cut the tractor part of the truck abruptly to the left so as to put the van across the highway almost at right angles. The testimony *Page 684 
of the driver of the van could not be obtained, and the only employee of the Herrin Company who was present and saw the accident and who testified by deposition was a man named Goetz. Reading his deposition in connection with the statement which he gave shortly after the accident, it would appear that the van was being backed up at the rate of from three to five miles per hour; that the van was probably still moving at the time the bus struck it; that when he (Goetz) saw the bus approaching it was about 125 yards away, at which time the van was backing up at a speed of from three to five miles per hour. If the driver of the van was backing up across the highway when the bus was only 125 yards away — or say about the crest of the hill — he was guilty of the grossest kind of negligence in backing this large van across the highway in front of the approaching bus. Even though the driver of the van began to back up before the bus reached the crest of the hill, he was still negligent in failing to see and heed the lights of the bus, and in failing to take the proper precautions before blocking the highway. Our conclusion is that the van began backing up just about the time the bus reached the crest of the hill, or just prior thereto. We base this conclusion on the fact that the van backed some 30 or 40 feet after it began moving backwards at a speed of from three to five miles per hour, and as the bus was going at least 45 to 50 miles per hour, say ten times as fast as the van, the bus traveled from three to four hundred feet while the van was in the process of backing. If we have correctly pictured the situation, or even nearly approximated it, we think the trial judge was correct in holding both the Bus Company and the Herrin Company, together with their insurers, liable for the injuries received by plaintiff.
[6] In fixing the quantum of damages we have endeavored to divide the elements of damage into four phases: the loss of wages sustained by plaintiff from the date of the accident until he was discharged by his physician; his loss in wages from the latter date until the trial of the case; the impairment in his future earning capacity; his pain and suffering, and medical expenses.
Plaintiff received a number of bruises, cuts and lacerations, practically all of which have healed, leaving a few scars. The most serious part of his injury was to his right arm, shoulder and wrist. He had a fracture of the right wrist with a displaced fragment and a rather poor alignment of the bones. His arm was put in splints for several weeks, and he was treated by a local doctor from the time of the injury, August 1st, until December 28th, a period of about five months, during which time it is practically conceded that he was disabled from doing his work. He was working at a shipyard and was getting the present inflated wages being paid at those yards. He was a welder (by trade a mechanic) and was receiving, according to his testimony, from $83.75 per week to as much as $103.75 per week. We think an average earning of $350 per month for the five months before he was discharged by his physician would be a fair allowance, making the total allowance under this item $1750. After he was discharged by his physician, he was able to do some work — in fact the doctors all state that exercise and use of his arm and wrist would help in bringing about more normal function. While plaintiff did make an effort to do some kinds of work after he was discharged by his doctor, in view of the demand for qualified workers like plaintiff, it seems to us that he could have earned considerable amounts from that time up to the date of the trial, almost nine months later. It was certainly his duty to minimize the damage as much as possible, as well as to make a reasonable effort to use and exercise his arm. We think an allowance of around $200 per month for loss in earning capacity from the date of his discharge to the time of trial would be ample for that period. That would give him another allowance of $1750.
For his loss of earning capacity after the trial we must rely more on estimates. There is no doubt but that there is an impairment in the use of his shoulder, wrist and some of his fingers of his right hand. He could not move his shoulder freely and could not flex his wrist and fingers to a normal degree. This impaired his grip and the use of the tools of his trade. Some of the doctors think the impairment will practically disappear with use, while some think there will remain a certain impairment in doing certain types of work. They all agree that the disability will be decreased by time and use. Plaintiff is a man of fifty six years of age, and under normal conditions and without any injury, he may expect his earning capacity to diminish as the years pass. Taking all *Page 685 
of these factors into consideration, we think an award for this item of $3500 would be justified.
Plaintiff suffered considerable pain and discomfort for several weeks. An allowance of $1000 for that item would not be out of line. There seems to be no dispute about the medical expense allowance of $111.
In fixing the award we have not been unmindful of the decrease in the purchasing power of the dollar, and we feel that the total of $8111 will do justice to all parties.
For the reasons assigned, it is ordered that the judgment appealed from be amended by reducing the amount of the award from $13,111 to the sum of $8111, and as thus amended, the judgment is affirmed; plaintiff to pay the cost of the appeal, and the defendants to pay all other costs.