76 So.2d 599 (1954)
Edward THOMAS and Mrs. Edward Thomas, Plaintiffs-Appellants,
v.
Charles Marion LOBRANO et al., Defendants-Appellees.
No. 8266.
Court of Appeal of Louisiana, Second Circuit.
December 1, 1954.
Rehearing Denied January 4, 1955.
Writ of Certiorari Denied February 24, 1955.
*601 James H. Trousdale, Jr., Monroe, for appellants.
Hudson, Potts, Bernstein & Davenport, Theus, Grisham, Davis & Leigh, Monroe, Adams & Reese, New Orleans, for appellees.
HARDY, Judge.
This is an action in tort which was instituted by plaintiffs, husband and wife, for the recovery of damages. Defendants were named as being Dr. Charles M. Lobrano, the St. Francis Sanitarium, Inc., of Monroe, Louisiana, and Aetna Casualty & Surety Company, the liability insurer of said defendants. An exception of no right of action filed on behalf of the defendant Sanitarium was sustained, by agreement of counsel, and there was judgment dismissing plaintiffs' suit with respect to such defendant. A further exception of no cause of action interposed on behalf of the defendant Sanitarium and its insurer was overruled. This action, of course, no longer has any effect with respect to the Sanitarium, and the defendant insurer has not contested the action on appeal. A plea of prescription on behalf of defendants, Lobrano and the insurer, was overruled after trial of the issue presented by such plea, which ruling is seriously urged by defendants as constituting error. After trial on the merits there was judgment rejecting plaintiffs' demands, from which they have prosecuted this appeal.
This action is of the kind commonly classified or designated as a malpractice suit. Because of the extremely broad significance of the word, and because of the unpleasant connotations of the term which are generally and for the most part erroneously accepted as conveying the implication of *602 evil or unethical practices, we prefer to and will intentionally avoid the use of the expression as being inappropriate to the facts and circumstances concerned in this case.
Plaintiffs' action, as we have first above stated, is one arising, ex delicto, based upon allegations of negligence and lack of due care in professional treatment by the defendant physician under the provisions of Article 2315 of the LSA-Civil Code.
By way of preface to this opinion we quote with approval and wholehearted agreement the following statement from brief of counsel for defendants:
"The record in this case presents a rather interesting story, which partakes at times of the nature of pure fiction and may well be the basis of a modern day novel."
This case is presented to us on appeal superimposed upon the unattractive background of charges and counter-charges by all parties concerned. The voluminous record, comprising approximately 1,300 pages of testimony, numerous exhibits, and briefs of counsel totaling additional hundreds of pages, is replete with evidences of passion and prejudice embracing a comprehensive category of human faults and failings. Implicit in the record, and particularly to be deplored, are unmistakable evidences of personal bad feeling and displays of temper by members of both the medical and legal profession who have unfortunately permitted themselves to indulge in ugly personalities. Their conduct, which should have been actuated by the highest motives of impersonal professional standards, has served only to further complicate the resolution of a fair, equitable and just conclusion, which was their only concern. Into this cauldron of violent litigation have been poured the strange and furious elements of suspicion, envy, jealousy, in short, the most unworthy of human feelings. From this seething mass of poisonous potions it is our responsibility to attempt to effect the distillation of the essence of justice which is the hoped for end result. In the effort to achieve this purpose we propose to disregard all factors which are extraneous and irrelevant, and will confine our opinion to a consideration of the ultimate issues of facts and law.
Before proceeding to a discussion of the merits it is desirable to pronounce upon the action of the trial court in overruling defendant's plea of prescription which is zealously re-urged on this appeal. Plaintiffs alleged in their petition that x-ray treatments were administered to the plaintiff, Mrs. Thomas, by the defendant, Dr. Lobrano, during the months of January, June and September, 1952. Plaintiffs' petition was filed September 3, 1953. As a basis for the plea of prescription defendants set up the incorrectness of this allegation and averred as a fact that no treatments were given by the defendant during the year 1952. This pleading tendered for determination a purely factual issue which was tried and disposed prior to the filing of answer by defendants.
On trial of the plea defendants submitted the testimony of the defendant Lobrano, who positively and repeatedly denied the administration of x-ray treatments to the plaintiff, Mrs. Thomas, at any time during the year 1952. This testimony was corroborated by that of Mr. Ennis, Mrs. Gunn and Mrs. Lawler, the first two being technicians and the other a receptionist-secretary, all employees in the x-ray department of St. Francis Sanitarium. While the testimony of these witnesses was very positive on the point that Mrs. Thomas had not received x-ray treatments during the year 1952 the effect of the testimony was substantially weakened by their eventual admissions that their testimony was based upon the lack of any record of treatment during the year 1952 in the files of the x-ray office or department, and not upon independent and certain personal knowledge.
On behalf of plaintiffs the record discloses the equally certain and positive testimony of the plaintiff, Mrs. Thomas, with reference to treatments received in January, June and September of the year 1952, the September treatments being fixed as having been administered at or about the 15th or 20th days thereof. Mrs. Thomas' testimony was corroborated in part by the *603 testimony of her husband, her mother, father and a friend, which witnesses, on one or another of the occasions fixed as being the time of treatments in the year 1952, had accompanied Mrs. Thomas on her visits to the Sanitarium for such purpose. Further corroborative evidence is found in the testimony of Mrs. Thomas' employer to the effect that he had given her permission to absent herself from work at various times in the period concerned for the purpose of undergoing treatment.
While it is our opinion, after careful examination of the testimony of the witnesses above noted, that exceptors failed to sustain the burden of establishing the facts set forth as the basis for their plea, we are finally and completely convinced by two other factors, first, the testimony given by deposition of Dr. P. C. Worley of Shreveport, and, second, the admission in evidence of a record of treatment signed by the defendant, Lobrano.
The testimony given by Dr. Worley establishes the fact that he was first consulted by Mrs. Thomas on September 26, 1952, at which time she gave a history of having received x-ray treatments at a time just prior to that date. On the occasion of this visit and his examination Dr. Worley diagnosed Mrs. Thomas' trouble as radiodermatitis, but testified that this diagnosis and its meaning were not explained to Mrs. Thomas until the occasion of another visit on Easter Sunday morning of 1953. We point out that Dr. Worley's testimony is not only corroborative, at least to some small degree, on the point of x-ray treatments administered in September, 1952, but it is conclusive as establishing the fact that certainly as late as several months subsequent to September 26, 1952, Mrs. Thomas was unaware of the true nature of the trouble from which she suffered.
Finally, the effect of the record of treatment to which we have above referred and which we will discuss in considerable detail at a later point in this opinion, with reference to the merits of the case, completely destroys the validity of Dr. Lobrano's testimony that he administered no treatments to Mrs. Thomas at any time in the year 1952. The "record of treatment" appears to refer to treatments received in the year 1951, but on the same there appears, admittedly in the handwriting and over the signature of "C. M. Lobrano", the notation:
"Also received such treatments in 1950 & 1952."
It is true that the effect of the above notation is violently attacked by defendants by reason of the circumstances and the representations under which it was procured, which points we will also discuss in detail in the opinion with reference to the merits of the case.
By way of rebuttal defendants offered the testimony of an attorney at law who had been consulted by Mrs. Thomas sometime shortly preceding a visit to Dr. Worley in Shreveport. It was shown that after being consulted by Mrs. Thomas, and after her employment of another attorney for the prosecution of this case, this witness was consulted by the defendant, Dr. Lobrano, in whose interest he wrote a letter to the defendant insurance company, in which he represented himself as attorney for Dr. Lobrano, and expressed his opinion as to the doctor's freedom from liability, for which service he was compensated by Dr. Lobrano. Plaintiffs waived the right to claim immunity arising from privileged communications between attorney and client, and consented to the unrestricted examination of the witness. Despite a somewhat remarkable exhibition of detailed recollection, we think the testimony of the witness can be construed as having little, if any, probative value because of the contradictions which are implicit therein.
We think there can be no question as to the correctness of the action of the district judge in overruling the plea of prescription, inasmuch as we hold that plaintiffs satisfactorily and acceptably established the administration of treatments in September, 1952, and the further fact that the plaintiff, Mrs. Thomas, was not shown to have been fully cognizant of the nature *604 and cause of her physical condition until several months thereafter.
On the merits, plaintiff, Mrs. Edward Thomas, alleged that in January, 1950, the defendant, Dr. Charles M. Lobrano, radiologist and chief of the x-ray Department of the St. Francis Sanitarium in Monroe, began the administration of x-ray treatments to the said plaintiff in the effort to cure a troublesome and painful condition from which plaintiff was suffering, caused by the existence of numerous boils in both armpits. It is alleged that these x-ray treatments were repeated at approximately three month intervals during the years 1950, 1951 and 1952; that the periodic treatments were administered in a series of three at intervals of approximately two days, and that each treatment of a series involved the application of x-ray to both right and left axillae. The patient further alleged that by September, 1952, the treated area of the axillae had become exceedingly dry, affected by a frequent cracking and bleeding of the scaly and crusted skin surface, which was accompanied by an extreme burning and itching sensation resulting in constant pain and discomfort. The patient also avers that following the last treatment, at or about the middle of September, 1952, Mrs. Thomas was advised by the defendant, Lobrano, that she should not have any further x-ray treatment; that thereafter this plaintiff consulted a dermatologist who diagnosed the then existing condition as chronic radiodermatitis necessitating the excision of the affected areas of the axillae; that plaintiff submitted to the recommended operations, which were performed on June 22 and July 2, 1953, in connection with which procedure the skin excised from the axillae was replaced by grafts of skin from plaintiff's thighs.
Averring that the condition of chronic radiodermatitis was solely caused by the negligence of the defendants, Lobrano and the named Sanitarium, plaintiff, Mrs. Thomas sought recovery for damages for personal injuries and her husband claimed reimbursement of sums expended in the treatment of his wife.
Following the action of the court in dismissing the suit as to the Sanitarium and the dismissal of the plea of prescription, the defendants, Lobrano and the Aetna Casualty & Surety Company, filed answer to plaintiff's petition, generally denying the allegations thereof, except for the admission of the administration of certain specified x-ray treatments, and by way of further answer it was affirmatively averred that the defendant Lobrano was possessed of and had exercised that degree of skill and learning customarily possessed and exercised by the members of his profession in good standing and practicing in similar localities; that at all times he had used reasonable care and diligence and exercised his best judgment in treatment, and that he had employed proper and adequate equipment in connection therewith.
Reverting to the allegations of plaintiffs' petition it is observed that plaintiffs specifically invoked the application of the doctrine of res ipsa loquitur. In the exercise of full precaution and care, and in the nature of alternative pleading in the event of failure to apply the doctrine of res ipsa loquitur, plaintiffs alleged specific acts of negligence.
There are comparatively few facts involved in the instant case which were established without dispute. Of these we particularly note, as having material bearing upon the issue presented, that the plaintiff, Mrs. Thomas, in January, 1950, and for an indeterminate period of time immediately prior thereto, was suffering from a skin affection under both armpits; that x-ray treatments were administered by the defendant, Charles M. Lobrano, during the years 1950 and 1951; that the plaintiff, Mrs. Thomas, continued to suffer from a skin disturbance which caused serious pain, discomfort and inconvenience; that the condition was finally corrected by surgical procedures involving the excising of the affected areas of the axillae and the grafting of skin taken from plaintiff's thighs.
In violent dispute are those issues of fact as to the alleged administration of x-ray treatments in the year 1952; the effect of *605 the treatments; the negligence or lack of care and skill on the part of the defendant doctor, and the actual diagnosis of Mrs. Thomas' condition.
On the factual propositions last above enumerated there is a hopeless and utterly irreconcilable conflict of evidence. The learned judge of the trial court expressed the opinion that plaintiffs failed to make out their case by a preponderance of the evidence, and, admittedly, this is the factual point here tendered on appeal, the resolution of which must determine the cause.
Before proceeding to a consideration of the facts we think it desirable to discuss the proposition of law as to the applicability, vel non, of the doctrine of res ipsa loquitur. We think this point has recently been completely resolved by the Supreme Court of Louisiana in Meyer v. St. Paul-Mercury Indemnity Company of St. Paul, Minn., 225 La. 618, 73 So.2d 781, 786. In the opinion of the court on rehearing the court declared:
"That jurisprudence as pointed out in the original opinion is that the law only exacts of physicians, surgeons and dentists that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them. Regardless of what the jurisprudence may be in other jurisdictions, this Court and the Courts of Appeal of the State have adopted the rule as stated as is made apparent in the several cases cited in the original opinion.

"The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence." (Emphasis supplied.)
It is obvious from the above emphasized portion of the court's pronouncement that the burden in the instant case is upon the defendant physician to affirmatively establish his use of reasonable care and diligence, together with his best judgment, in his treatment of the plaintiff, Mrs. Thomas. It follows as a corollary that the defendant is also under the burden of negativing the many specific charges of negligence or want of proper care.
With respect to their application under this rule of law the facts of the instant case must be examined. At the very outset we point out that the resolution must depend, not as stated in the opinion of the district judge upon the failure of plaintiffs "to make out their case by a preponderance of the evidence," but, rather, upon the success or failure of defendant in acquitting himself of liability by a preponderance of the evidence.
For the purpose of obviating a detailed discussion of irrelevant testimony, we wish to emphasize the point that liability, vel non, must be determined under the facts of this particular case. The proof of the exercise of skill, care, diligence and good judgment must be considered only with relation to this case. It follows, therefore, that the professional reputation, standing, ability and conduct of the defendant, as evidenced in connection with the treatment of any number of other individuals, is irrelevant. In this connection we think it appropriate to observe that the *606 attainment of a professional status, per se, does not endow a man with the exclusively divine attribute of infallibility. No matter what dizzy height of professional eminence a man may achieve he, nonetheless, remains human and therefore subject to error, be he lawyer, judge, educator, doctor, soldier, scientist or minister. "Professional" is not synonomous with "perfection". Happily, in the instant case there is not the slightest implication of any evil or unethical conduct on the part of defendant.
On behalf of defendant some fourteen medical practitioners of Monroe testified as to their opinion of the excellent professional reputation of Dr. Lobrano, and their satisfaction with results obtained in cases of their patients, referred to him for specialized treatment. By stipulation of counsel it was agreed that an additional eight members of the profession practicing in Monroe would have given similar testimony if called to the witness stand. As we have above pointed out, this testimony, no matter how impressive as to general standing, ability and professional reputation, is completely irrelevant, since it has no relation to the facts concerned in the instant case, and, therefore, the same must be disregarded.
One of the most important and material facts at issue, and which is in irreconcilable dispute as between witnesses for the parties litigant, concerns the number of therapy treatments administered to the plaintiff, Mrs. Thomas. We think there is no room for doubt as to the fact that in January, 1950, and for a period of time prior thereto, Mrs. Thomas suffered from a most painful, irritating and uncomfortable skin affection which was localized in the axillae. Nor is there any question as to the fact that the defendant, Dr. Lobrano, began the administration of superficial x-ray therapy treatments for the relief of the existing condition in January, 1950, and that three treatments were administered during the said month, but at and from this point there is a completely irreconcilable conflict of testimony.
As we have above noted, the plaintiff, Mrs. Thomas, alleged that she received treatments at intervals of approximately three months in a series of applications of x-ray therapy to each axilla, in the years 1950, 1951 and 1952, and to this she testified. This allegation is vigorously and positively denied by the testimony of the defendant Lobrano. According to the defendant he treated Mrs. Thomas three times in January, 1950, one time in March, 1950, one time in May, 1950, and four times in September, 1951, each treatment consisting of the administration of x-ray therapy to each axilla.
It is evident to us that Dr. Lobrano's testimony as to the number and times of treatment is based upon the records on file in the x-ray department of St. Francis Sanitarium, of which he was head. In this connection it is pertinent to observe that one of the specific allegations of negligence incorporated in plaintiffs' petition was the charge that complete and accurate records of the administration and dosage of therapy treatments to plaintiff, Mrs. Thomas, had not been maintained, and that the defendant, Lobrano, did not know "how many treatments and how much x-ray dosage was administered * * *."
We are here confronted with what we regard as the most confused and uncertain, as well as the most important issue in the case. At some time near the middle of the month of May, 1953, plaintiff, Mrs. Thomas, telephoned defendant Lobrano and requested a record of x-ray treatments which he had administered to her, advising that she intended consulting a surgeon in New Orleans with reference to the advisability of the excision of the affected areas in her armpits and wished the record for his information. Following this request the plaintiff, Edward Thomas, called at Dr. Lobrano's office in the St. Francis Sanitarium for the purpose of procuring the record of treatments of his wife. This visit, as best we can determine, was made about 1:00 o'clock P. M. on Saturday, May 16, 1953. At the time of Thomas' arrival Mr. Ennis, a technician in the x-ray department, was present in the outer office *607 and Miss Lawler, the receptionist-secretary, and Dr. Lobrano were in the latter's private office. After Mr. Thomas arrived it appears that all parties present undertook a search of the files in the effort to locate Mrs. Thomas' record. The result of this search produced a record of certain treatments apparently administered in the month of September, 1951. Because of the importance which we attach to this question involving the keeping of records, we think it necessary to exactly reproduce the obverse and reverse of the form sheet, which, accordingly, is depicted below:

*608
 (REVERSE)
 STANDARD CHART FOR ROENTGEN THERAPY
NAME: NO.
ADDRESS:
DIAGNOSIS:
PREVIOUS TREATMENT:
CLINICAL NOTES:
DISEASE. LOCATION. EXTENT. PATHOLOGY:
DISEASE MEASUREMENTS:
BODY MEASUREMENTS:
PLANS FOR TREATMENT:
FORM 17 2500, 1-50 QUALITY
The memorandum on the face of the form in the following words:
 "Also received similar treatments
 in 1950  and  1952 & 1952
 C. M. Lobrano"
was appended by Dr. Lobrano. It is contended that this memorandum was written by the defendant only in acquiescence to the insistence of the plaintiff Thomas. As best we can ascertain from the testimony of the parties who were present, this "insistence" appeared to consist only of the statement, which was repeated several times by Thomas, that his wife had received treatments in 1952. In any event, it is certain that Dr. Lobrano wrote and signed the memorandum.
The action of plaintiff in securing this record of treatment has been bitterly attacked by counsel for defendants on the ground that it was accomplished by the exercise of deceit and trickery and that the reason advanced to Dr. Lobrano by Mrs. Thomas for wanting the record was pure subterfuge. In support of this attack counsel urged that the record was not used by plaintiffs and was never presented to the physicians Mrs. Thomas consulted in New Orleans on May 18th. There is no question on this point for Mrs. Thomas admitted that she did not use the record for this purpose. Nor do we think there is any question as to the correctness of the conclusion that plaintiffs were actuated by the desire to procure a written note of treatment which would be valuable in the prosecution of the action for damages which, quite obviously, they had in mind at the time. But it is equally clear that otherwise plaintiffs would not have procured this record and Dr. Lobrano's admission of other treatments as expressed in the memorandum thereof, for Dr. Lobrano testified:
"I didn't know she was going to put a suit against me; if I had known anything like that I would not have given her any records." *609 Subsequent to the incident above related it appears that another record of treatment was located, which record is also reproduced below:

*610
 (REVERSE)
 STANDARD CHART FOR ROENTGEN THERAPY
NAME: NO.
ADDRESS:
DIAGNOSIS:
PREVIOUS TREATMENT:
CLINICAL NOTES:
DISEASE. LOCATION. EXTENT. PATHOLOGY:
DISEASE MEASUREMENTS:
BODY MEASUREMENTS:
PLANS FOR TREATMENT:
FORM 17 2M 8-51QUALITY
While we have striven to avoid burdening this opinion with excessive detail, we think the records in question are of such vital importance to a resolution of this case that we are impelled to comment upon them at some length.
First, we think it is clear from Dr. Lobrano's testimony that his denial of x-ray treatments of Mrs. Thomas in the year 1952 was based upon the fact that he found no record of such treatments in his files. The following extract of Dr. Lobrano's testimony is conclusive:
"Q. Now, doctor, actually having sometimes as many as 30 or 40 or 50 patients a day you don't mean to tell me that you can remember now sitting here and state categorically and swear to it that Mrs. Thomas never received a treatment. A. I'll swear to it.
"Q. Now wait a minutein 1952? A. That's right.
"Q. Of your own recollection? Now you are actually relying on your records aren't you? A. I'm relying on my records and we have no record of 1952 and I know that every patient that comes into St. Francis Sanitarium has a record made when they come into the St. Francis Sanitarium. It is either my secretary gets the patient's name or my Mr. Ennis gets the name or they come in there and I treat them and when I treat them I look the records up and put the notation about how many x-ray units the patient gets and where I treat them; I put it on the record.
"Q. So that you are actually relying on whaton the record to make that statement? You don't propose to say that you can know definitely or swear to it of your own recollection that she never got a treatment in 1952? A. She didn't get a treatment in 1952.
"Q. I mean of your own recollection now? You are going by the record aren't you? A. I have a record Mr. Trousdale; she got treatment in 1950, I have those records there. I have the records where she got treatments in 1951, so why don't I have a record in *611 1952. I didn't know she was going to put a suit against me; if I had known anything like that I wouldn't have given her any records. I didn't know they were getting ready for any suit. * * *"
We think it necessary to point out that it is practically impossible to disassociate the several factors which are concerned, with respect to a consideration and evaluation of the records, from relation to the different facets of the case upon which they have material bearing. We will, therefore, discuss the record as such and then draw from the discussion the conclusions we feel to be appropriate.
It is seriously urged that the records above reproduced are the personal professional records of the defendant, Dr. Lobrano. It is to be observed that on their face the forms purport to be records of the St. Francis Sanitarium and the testimony indisputably establishes the fact that these are the only records of x-ray therapy in the files of the Sanitarium. It follows, therefore, that there can be no severance as between the files of Lobrano, the head of the x-ray department, and the files of the Sanitarium, for, in this instance at least, they must be considered one and the same.
There is noted in the upper right-hand corner of the form of March 17, 1950, the name "Dr. Guerriero". The defendant, Lobrano, testified that he placed the name of Dr. Guerriero and the diagnosis "eczema of armpit" on the record because Mrs. Thomas had been referred to him by Dr. Guerriero. This fact is not only denied by Mrs. Thomas but is absolutely refuted by Dr. Guerriero. It is true that on the date of the other record, which is shown as "September 7th, 1951", Mrs. Thomas was a bed patient in the Sanitarium, having been hospitalized by Dr. Guerriero, and she remained a patient during the period covered by the treatment shown on the form.
Adverting to the 1950 record, we point out the memorandum shown thereon: "Rec'd. 3 treatments Jan. 1950, 75 R. each treat."
Again, according to the uncontradicted testimony, this notation was placed on the record by an employee of the department, Mrs. Gunn, and the note "Total 225" was written by Dr. Lobrano. Although Dr. Lobrano testified that his records were never destroyed, he did admit in his testimony that in this instance the original record of the January, 1950 treatments had been thrown away when the "transfer" of such treatments was made to the March 17th record. What, if any, details of treatment were reflected by the January record must, therefore, remain unknown.
It is obvious, even from a casual examination, that original entries on the 1950 record have been considerably altered. Dr. Lobrano explained these alterations were designed to correct an error as to the date in one instance and to establish totals of roentgen units administered in another. Unquestionably, some of the alterations were made for the benefit of the adjuster of the defendant insurer after notice of this suit.
With respect to the adequacy, vel non, of the records from a professional standpoint, again the testimony of the medical witnesses is hopelessly at variance, some asserting that the records were inadequate, while others contended that they were sufficient. However, we note that, for the most part, the testimony in support of the sufficiency of the records was qualified by the consideration of the same as the private and personal records of the radiologist who administered the treatment.
An examination of Dr. Lobrano's testimony in itself is sufficient to establish the fact that the information reflected on the records is incorrect and inaccurate. It is therefore evident that the so-called "record of treatment" was not only carelessly and inaccurately compiled; that the treatment was not fully reflected in all essential or desirable details, but that the record was changed and altered subsequent to the making thereof. In our opinion, even to the lay mind, the conclusion is inescapable that these records are completely worthless both as to any probative value in establishing the number of treatments and as to correctly detailing the method of administration thereof.
*612 It is a matter of common knowledge that the use of x-ray treatments is highly dangerous and it follows that the careless or inefficient administration of x-ray therapy is susceptible of disastrous consequences. It is true that Dr. Lobrano contends that records are relatively unnecessary to his administration of x-ray therapy. We not only question the correctness of this assertion but we are convinced that the record of the instant case is completely destructive of any claim of justification for such a conclusion. In the light of the established fact that the x-ray department of the Sanitarium accommodates an average of between 20 to 40 patients per day for photographs and treatment, we think the failure of the physician in charge of the department to maintain and avail himself of proper information which should be reflected by adequate records is a dangerous practice. In this connection we have been interested in the examination of a text book entitled "Doctor and Patient and the Law" by Louis J. Regan, M.D., LLB., a distinguished member of both the professions of law and medicine. The work itself is designed to advise members of the medical profession as to the method and conduct of the practice thereof with specific reference to the avoidance of possible liability in answer to false claims of malpractice. This purpose is set forth in the author's preface to the second edition of his work as follows:
"In respect to cases of actual malpractice, the professional groups must recognize certain fundamental truths. There will be a few instances of injury to patients resulting from the ignorance, carelessness, or culpability of professional attendants when the moral and ethical standards of the practitioners are consistently high. However, adherence to the highest possible moral and ethical standards will not eliminate all false claims of malpractice. In respect to such fraudulent cases, professional men have a further responsibility. There will be a few instances of injury to doctors resulting from misguided or malicious patients when practitioners understand fully how to govern and protect themselves under the law."
With particular reference to the use of x-ray apparatus, after observing that it behooves the physician to exercise the greatest care in the employment of such an instrumentality, the author observes:
"Physicians using such potentially dangerous instruments should install every available safety device, have apparatus regularly checked, and fully inform themselves as to how to give the maximum protection to the patient under treatment."
* * * * * *
"X-ray records, as well as the entire case record, should be carefully preserved beyond the time during which a malpractice action may be brought." Op. cit. supra, p. 395.
In the work entitled "Attorneys' Text Book of Medicine" by Roscoe N. Gray, M. D., Surgical Director, Aetna Casualty & Surety Company, Hartford, Conn., we find the following observation:
"It is obvious that x-ray and radium treatments are difficult to control, not only because of the considerable variation between the action of these agents upon different parts of the body, but also because of the difficulties in subjecting the patient to a known dosage." Page 874, Volume 1, 3rd Ed.
We pretermit further detailed consideration, for our careful examination of all the testimony bearing upon the keeping of records leads us to the conclusion that those submitted must be considered as definitely unsatisfactory and inconclusive. Particularly we think that they are not only subject to serious criticism, even by casual standards, but that they are almost entirely valueless with reference to the establishment or corroboration of the details of treatment which are essential in a determination of a case of this nature.
With reference to the bearing and effect of the memorandum on the 1951 records as evidence of treatments in 1952, we find it difficult to believe that a doctor, of the standing and reputation of Dr. Lobrano, could be influenced to make an unqualified *613 statement of such treatments in the very teeth of what he asserted to be positive knowledge that such treatments had not been administered. So far as Dr. Lobrano knew at the time, the record was intended for use by one of his patients in aid of consultation with reference to surgical procedure. It is not conceivable that he would have made a notation of this character if he did not believe it to be accurate, well knowing under such circumstances that it might be seriously misleading to one of his professional brethren.
As we first observed, upon the authority of Meyer v. St. Paul-Mercury Indemnity Company the burden of proof in the instant case is upon the defendant to clear himself of liability arising from negligence, or lack of care. We think the defendant has failed to discharge this burden and to clear himself of the charge of negligence which is predicated upon his failure to have kept complete and accurate records of the treatment of the patient, Mrs. Thomas. It follows, almost without the necessity of specific comment, that all his testimony, which is based upon the records of treatment, fails to establish the conclusion which he urges.
We turn now to the consideration of another bitterly contested issue, namely, the diagnosis of Mrs. Thomas' condition following her treatment by Dr. Lobrano, which condition unquestionably necessitated the surgical operations to which she was subjected.
On September 26, 1952, Mrs. Thomas consulted Dr. P. C. Worley, a highly reputable and ably qualified physician, of Shreveport, specializing in dermatology. Dr. Worley diagnosed Mrs. Thomas' condition as "chronic radiodermatitis". On May 11, 1953, Mrs. Thomas was examined by Dr. F. E. Polen, also a highly qualified and reputable physician, of Monroe, specializing in the practice of dermatology, and Dr. Polen diagnosed her condition as "bilateral axillary chronic radiodermatitis."
On May 18, 1953, Mrs. Thomas was examined by Dr. Leslie K. Mundt, a distinguished dermatologist of New Orleans, who diagnosed her condition as "chronic roentgen dermatitis." On the same date Mrs. Thomas was examined by Dr. Richard W. Vincent, a New Orleans surgeon, to whom she was referred for examination by Dr. Mundt. While Dr. Vincent did not testify, there is in the record a copy of his report which does not state a diagnosis, but which concludes with an opinion recommending an excision of the affected areas of the axillae. Again, on the same date, Mrs. Thomas was examined by Dr. Neal Owens, an outstanding plastic surgeon of New Orleans, who testified that his diagnosis was "radiodermatitis of both axillae." Dr. Owens recommended excision and skin grafting.
Both Dr. Worley and Dr. Owens procured independent pathological examinations of a skin section, and both these witnesses testified that the reports of the pathologists confirmed their respective diagnoses. Because defendants seriously urge that the pathological findings to which reference has been made are subject to question with reference to the weight of confirmation which should be drawn therefrom, we quote the reports of the pathologists.
The pathological report furnished Dr. Worley by Dr. W. R. Mathews, a pathologist of Shreveport, after microscopic examination, reads as follows:
"The sections reveal thickened epidermis with acanthosis and hyperkeratosis associated with fibrosis and telangiectasis of the corium. In this latter location one finds islands of squamous epithelium which probably represent squamous metaplasia in cutaneous glands. I note in the history that the diagnosis here is chronic radiation dermatitis. Certainly these changes would be consistent with chronic radiation dermatitis."
The report rendered by Dr. George H. Hauser of New Orleans to Dr. Owens reads as follows:
"Dense fibrosis of subcutaneous tissue with hyalinication, chronic inflammation, telangiectasia, atrophy of skin and appendages."
*614 As opposed to the findings of the doctors above named defendant offered the testimony of Dr. Henry E. Guerriero, a highly able and esteemed general practitioner of medicine and surgery in the City of Monroe. This was the only medical witness available to defendant who had examined Mrs. Thomas prior to the operations to the axillae. Dr. Guerriero was Mrs. Thomas' family physician and had been consulted by her in August and September 1951 with reference to her skin affection. After having been treated several times during the month of August Dr. Guerriero admitted Mrs. Thomas to the St. Francis Sanitarium on August 25th, where she remained until she was discharged on September 14th. The hospitalization was indicated at this time, in the opinion of the witness, because of some female disturbance, a condition of extreme nervousness and the effect of the skin affection. Dr. Guerriero testified that it was his understanding that Mrs. Thomas had three superficial x-ray therapy treatments by Dr. Lobrano during the period of her hospitalization. Following her release from the Sanitarium Mrs. Thomas continued under Dr. Guerriero's treatment on occasions during October and November, following which period he did not again see Mrs. Thomas as a patient until August, 1952. Mrs. Thomas made several visits to Dr. Guerriero in August and September, which, however, according to the doctor's testimony, were occasioned more by reason of her anemic condition than for treatment to her axillae. The doctor testified that he saw Mrs. Thomas on September 30, 1952, at which time she reported that she was being treated by Dr. Worley, who had advised an excision of the involved areas, and that he did not see her thereafter until May 13, 1953.
Dr. Guerriero refused to subscribe to the diagnosis of chronic radiodermatitis, and insisted that the skin affection from which Mrs. Thomas suffered was "an old chronic eczema."
On February 24, 1954, which was the day before the beginning of trial of this case on the merits, Mrs. Thomas was examined by Dr. James E. Walsworth and Dr. James Q. Graves, eminent practitioners of medicine and surgery in the City of Monroe. These doctors made a most thorough examination of Mrs. Thomas but, of course, they were completely unable to express any opinion or make any diagnosis of the condition which had existed prior to the excision and skin grafting which had been performed on Mrs. Thomas in 1953. However, the witnesses were presented with enlarged, colored photographs of Mrs. Thomas' axillae, which photographs had been made on February 22, 1954. From their examination of these photographs these doctors expressed the opinion that Mrs. Thomas had suffered from a chronic dermatitis or telangiectasis and not from chronic radiodermatitis.
We do not think there can be any possible doubt as to the conclusion that the diagnosis of chronic radiodermatitis has been convincingly established by a substantial preponderance of the expert testimony. We feel it is entirely unnecessary to indulge in any extensively detailed discussion on this point. We think members of the medical profession themselves would be the last to concede that the unanimity of opinion among highly qualified dermatological specialists and a renowned surgeon, all of whom had been accorded the benefit of thorough examination of the patient and two of whom had taken the precaution of procuring pathological reports, could be over-balanced by the testimony of three practitioners in the general field of medicine and surgery, particularly when two of these three did not have the benefit of a personal examination of the patient at the time of the existence of the physical affection concerned.
It has been well and soundly established with reference to the evaluation of the opinion testimony of expert medical witnesses that the conclusions of qualified specialists in the various fields of medicine are entitled to greater weight than that accorded the opinions of general practitioners. Rider v. R. P. Farnsworth Co., Inc., La.App., 61 So.2d 204; Jenkins v. Central Culvert Co., La.App., 33 So.2d *615 72. Obviously, if this were not so there would be no reason for specialization in the various fields of medical practice.
We do not wish to be considered as minimizing in the slightest degree the serious contentions that are urged, nor would we for a moment be understood as discounting the ability of the witnesses for defendant and the validity of their opinions. But it is inescapable that the testimony of the defendants' witnesses on this point is primarily negative in nature and cannot possibly prevail over the vastly superior testimony of the qualified medical witnesses on behalf of plaintiffs.
The above observation also applies to the criticism that has been urged by astutecounsel for defendants of the acceptance of the pathological reports above quoted as confirmation of the diagnosis of chronic radiodermatitis. We cannot respond to this contention. As we appreciate the testimony the effect of these pathological examinations simply stands as confirmation of the diagnosis. We appreciate the fact, as is strenuously argued by counsel, that these pathological reports are not exclusively consistent with the diagnosis of chronic radiodermatitis and that they could equally be applicable to other disturbances in the nature of eczematic or telangiectasic manifestations. We do not think there has been any evidence of any purpose to establish the pathological reports as constituting a diagnosis, nor do we consider that they were intended to eliminate all possibilities other than chronic radiodermatitis. But we do feel assured that these examinations were designed, by the respective careful and capable specialists who ordered them, to check the consistency of the pathological conclusions with their diagnoses, and, certainly, the results served to confirm their opinions to this extent.
At this point we realize that, in the course of this opinion, we have indulged in frequent use of the unusual and somewhat technical medical term, radiodermatitis, which it is desirable to translate into lay language as an x-ray burn. There is nothing in the record which would cast any doubt upon the absolute certainty of the conclusion that if Mrs. Thomas was suffering from chronic radiodermatitis it was caused by the superficial x-ray therapy administered by the defendant, Dr. Lobrano. Nor is there any need to belabor the equally well defined conclusion that the injury resulted from the negligence or lack of care in the administration of the treatment by the said defendant. Examination and re-examination of the voluminous testimony, with particular attention to the testimony of the defendant himself, has convinced us that he has failed to exculpate himself from the consequence of his failure to use reasonable care and diligence, together with his best judgment, in the application of his professional skill in the treatment of this particular case.
We are thoroughly cognizant of the fact that we have not covered all of the grounds for relief which have been asserted by plaintiffs. Nor have we so attempted, for it is our opinion that the findings of fact which we have above related are more than sufficient to sustain the conclusion reached, and there is no need for pronouncement on other and less conclusive issues.
Although conceding the obvious legal proposition that the release of the St. Francis Sanitarium as a party defendant in the instant case, on the ground of charitable immunity, does not effect the release of its insurer, learned counsel for defendant, Aetna Casualty & Surety Company, nonetheless strongly urge that the said defendant is not liable as insurer of the Sanitarium. This conclusion is predicated upon the argument that the relation of employer and employee did not exist as between the Sanitarium and Dr. Lobrano, and, as a consequence, the doctrine of respondeat superior did not justify recovery against the Sanitarium as employer. Alternatively, it is submitted that even if Dr. Lobrano should be held to be the employee of the Sanitarium, there could be no recovery because he is a professional practitioner who acts upon his own initiative *616 and without direction and control of the employer.
Conceding, without admitting, the force and effect of the above stated contention, we observe that it does not, in our opinion, affect the liability of the insurer. According to the uncontroverted testimony of both Dr. Lobrano and the business administrator of the Sanitarium, the relationship existing was in the nature of a partnership. Under the agreement the Sanitarium furnished adequate space for the accommodation of the operation of the x-ray department, carried the employees thereof on its payroll, furnished and maintained the equipment, etc. After deduction of operating expenses the net profits remaining were divided equally between the Sanitarium and Dr. Lobrano. Under these facts we think it is clear that the relation which existed was that of a partnership.
On the basis of our findings of fact, as above set forth, we have, in effect, adjudged Dr. Lobrano guilty of neglect with respect to his failure to keep appropriate and accurate records of treatment. It is so clear, under our appreciation of the case, that this neglect is equally chargeable to the Sanitarium that we find it unnecessary to enter into a discussion of details. Under this conclusion it must be considered that the Sanitarium and Dr. Lobrano were joint tort-feasors and either, or both, are solidarily liable. In Abrego v. Tri-State Transit Co., La.App., 22 So. 2d 681, 682, the court declared that all persons "whose negligence concurred in and contributed to the injury are liable in solido * * *." In construing the liability of co-trespassers as a solidary obligation, under the provisions of Article 2324 of the LSA-Civil Code, the Supreme Court declared that the liability for damages caused by the negligence of two or more joint tort-feasors constituted a solidary obligation. Huguet v. Louisiana Power & Light Co., 196 La. 771, 200 So. 141, and cases therein cited.
It therefore follows that the insurer of the Sanitarium is answerable under the terms and provisions of its policy contract. We think this point would be subjected to additionally detailed demonstrations as to the correctness of the conclusion reached had we chosen to develop, in connection with plaintiffs' right to recover, some or all of the additional elements of fault, negligence and lack of care which have been, in our opinion, clearly established by the record before us.
There remains for consideration the question of the quantum of damages. For a considerable period of time, prior to the procedure of excision and skin grafting, plaintiff, Mrs. Thomas, unquestionably suffered extreme pain and serious annoyance and discomfort. Physical pain and suffering resulting from the operations were undoubtedly extreme in nature and degree. Nor do we think there can be any question as to the prolongation of a considerable degree of pain over a period of some months following the operations. However, we do not find that there is any reasonable expectation, nor, indeed, is there any showing in the record of a long period of duration of pain and suffering, and there is acceptable evidence of the fact that the operations have eliminated the painful affection from which she suffered prior thereto. We regard as the most serious factor in connection with the fixing of damages the permanent scarring and disfigurement which will result in a certain measure and degree of embarrassment and mental disturbance throughout the remainder of the life of this 32-year-old woman. Considering all of these factors, which under the circumstances of this case cannot be disassociated and separately evaluated, we think the allowance of $12,500 should be considered adequate.
With reference to the substantial claims of the plaintiff husband for medical and surgical treatment and expenses incident thereto and in connection therewith, the exhibits contained in the record and the testimony in support of his claims, in our opinion, justify an allowance in the total sum of $2,074.82, itemized as follows:

*617
Eye, Ear, Nose & Throat
 Clinic $657.72
The Owens Clinic 410.00
Dr. M. W. Middleton 75.00
Nursing charges 126.00
Hotel bills 171.37
Doctor bills 126.50
Traveling costs and related
 costs in connection with
 consultations and treatment 505.00
Drugs 3.23
 _________
 Total $2,074.82

Additionally, plaintiff husband further claims the loss of his wife's income as the operator of a beauty treatment establishment which, according to the uncontroverted testimony, was estimated at $50 per week. On the basis of an incapacity enduring for a period of eighteen weeks, this would entitle the husband to recovery of an additional amount of $900.
For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be set aside and reversed, and,
It is further ordered, adjudged and decreed that there be judgment in favor of plaintiff, Edward Thomas, and against the defendants, Charles M. Lobrano and Aetna Casualty & Surety Company, in solido, in the full sum of $2,974.82, with interest thereon at the rate of 5% per annum from date of judicial demand until paid, and
There is further judgment in favor of plaintiff, Mrs. Edward Thomas, and against the defendants, Charles M. Lobrano and Aetna Casualty & Surety Company, in solido, in the full sum of $12,500 with interest thereon at the rate of 5% per annum from date of judicial demand until paid.
It is further ordered that the liability of defendant, Aetna Casualty & Surety Company, be limited and restricted under the contractual provisions of its policy of insurance with the St. Francis Sanitarium and Dr. Charles M. Lobrano, to the total amount of $15,000, with interest.
Defendants are assessed with all costs.