## CHARLES S. FARWELL *v.* HARRIS & MORGAN.

In an action against the owners of a ship for the value of a slave carried away in the ship, the plaintiff, under the general denial, is bound to prove that he is the owner of the slave carried away.

It is a good defence to such an action, that another person than the plaintiff is the owner of the slave, and that the defendant was authorized and employed by such other person to receive the slave and carry him to another port.

The Clerk of the ship is a competent witness for his employers to prove the instructions given by the owner to the Clerk, in shipping the slave.

A formal release of a witness from any liability over to the party interrogating him, annexed to the interrogatories and transmitted with the commission under which he was examined, is sufficient to remove the objection to his testimony on the score of interest.

In an action against a common carrier upon the penal statute for taking slaves out of the State without the consent of the owner, the ostensible owner in whose name the slave was shipped, and the vendor of such owner, have no interest in the suit, and are competent witnesses for the defendant. The judgment in such an action is not conclusive as to the title to the slave.

The common carrier is not required, upon his own responsibility, to decide upon the validity of the title of shippers to property which is shipped, but the shipowner has complied with the law, if he has in good faith received the slave from a person claiming to be owner, and holding under an apparent title.

The court takes judicial knowledge that slaves are personal property in other States.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J. *H. Gaither*, for plaintiff. *Race & Foster*, for defendants and appellants.

BUCHANAN, J. On the 29th of December, 1853, a slave man named *Charles* was shipped by one *C. H. Hughes* on board the steamship Perseverance, belonging to the defendants, at the port of New Orleans, for transportation to Galveston, in the State of Texas; and a clearance for said slave was granted by the Collector of this port, upon oath being made, as directed by the Act of Congress of 2d March, 1807, by the shipper and by the master of the ship, that, to the best of their knowledge and belief, the said *Charles* was not imported into the United States since the 1st of January, 1808, and that, under the laws of this State, he was held to service and labor.

The present action is instituted by a person who alleges himself to have been, at the the time of said shipment, the owner of said slave *Charles*, and that said slave was taken out of the State, on board the steamship Perseverance, without his consent and against his wishes, by means of which taking the slave has been altogether lost to him. Plaintiff claims the value of said slave, stated at twelve hundred dollars; hire from the time of his abduction at the rate of twenty-five dollars per month; and in addition, a penalty of five hundred dollars, under the statute.

The first question which arises, under the pleadings and bills of exception, is the right of defendants to plead, and to prove, that the slave *Charles* belonged to another person than the plaintiff.

In all the statutes, four in number, which give an action against the owners of a ship for the value of a slave carried away in the ship, the action is in terms given to *the owner of a slave*. See Acts of 1816, p. 8; Acts of 1835, p. 152; Acts of 1839, p. 120; Acts of 1840, p. 90.

It is, therefore, an essential averment of the petition, that the plaintiff is the owner of the slave carried away; and the general denial puts him on the proof

of this fact. It is, consequently, a good defence to such an action, that another person than the plaintiff is the owner, and that the defendant was authorized and employed by that other person to receive the slave on board his vessel, and convey him to another port. The case of *Buel* v. *The steamer New York*, in 17 La. Rep., cited by plaintiff, is not inconsistent with this ruling. In that case the plaintiff offered in evidence his title (a bill of sale made in Florida,) in support of his allegation of ownership; and the objection made by defendant was, that the same had not been recorded in New Orleans. But the court held this ground of objection to be untenable; and observed, "there was no adverse title set up against that of plaintiff; the defendant did not pretend to own the slave, *nor to have any right contradictory with the plaintiffs.*"

But here, the case is directly the reverse. The defendants plead specially that "they received on board the said ship Perseverance a negro man named *Charles*, represented at the time to be a slave belonging to one *James L. McKeon*, residing in Galveston, Texas; but that said slave was duly passed at the customhouse by said *McKeon*, or his agent, and the regular customhouse clearance given before the said man *Charles* was taken on board, and which is the only precaution and protection the law affords and points out to common carriers, and your respondents are unable to know to whom slaves may belong— but as common carriers, when properly cleared at the customhouse, they are bound to receive and transport the same as required. That they did thus legally receive a certain negro *Charles*, properly cleared at the customhouse, as the property of one *James L. McKeon*, of Galveston, to whom, on the arrival of the ship Perseverance at that port, he was delivered and properly receipted for, and charges paid."

The answer of defendants next proceeds to aver, with circumstantial detail, that *James L. McKeon*, of Galveston, Texas, is the owner of the slave *Charles*, by two distinct titles; one derived from *Leonidas B. Harper*, (who is likewise the vendor of plaintiff,) and the other from *Richard Harper*, the father of *Leonidas*, whom the answer avers to have been the real original owner of the slave, and whose title was never divested, until the conveyance by said *Richard* to *McKeon*.

It is evident that the outstanding title in another than the plaintiff, thus pleaded, is a matter which had a direct pertinency to the defendants' liability to plaintiff in the manner and form as charged. The court did not err, therefore, in refusing to strike out those pleas, upon plaintiff's application, or to put defendants upon making an election.

The customhouse manifest and clearance of slave *Charles* by *Hughes*, were given in evidence by plaintiff; and *Hughes* was offered by defendant, and properly received by the court, to prove that in shipping the slave he acted as the agent of and by special instructions from *James L. McKeon*. The circumstance of *Hughes* being in the defendants' employ, as Clerk of the ship, did not render him incompetent. C. C. 2261. His testimony is corroborated by that of *McKeon*. *McKeon* and *Richard Harper* were examined under commission in Texas, and their depositions, with exhibits annexed, were offered by defendants. *Harper* was objected to as incompetent, on the ground of interest, and that it would be proving title to the slave by parol. *McKeon* was also objected to on the score of interest.

The objection to *Harper* was sustained by the court, and his deposition ruled out. That of *McKeon* was admitted by the court "only to show that said *Mc-*

FARWELL
v.
HARRIS.

Keon placed the negro on board the defendants' ship, claimed to be the owner of the negro, and paid charges for bringing him to Galveston, and for no other purpose."

We think these rulings of the court erroneous. A formal release of Mc-Keon from any liability over to the defendants was annexed to the defendants' interrogatories, and transmitted with the commission under which he was examined. But he would have been competent, even without the release. Neither he nor *Richard Harper* have any interest in the result of this suit, which is an action against a common carrier, upon a penal statute, for taking a slave out of the State without the consent of his owner.

We do not understand this statute as requiring the common carrier to decide, upon his own responsibility, upon the validity of the title of shippers to property which is shipped. We fully appreciate the considerations of public policy, which have dictated the laws under review, in relation to the particular kind of property in question. But the shipowner has complied with the law, if he has in good faith received the slave from a person claiming to be owner, and holding an apparent title to the slave; and we take the very best witness, in support of such a defence, to be the party from whom he has thus received the slave. It is to be observed, that neither in the pleadings, nor in the evidence, is the slightest imputation thrown upon the good faith of the defendants. On the contrary, the evidence on both sides shows that the plaintiff has himself to blame, in a great measure, for the jeopardy, if not the loss, of the money advanced by him to *Leonidas Harper* upon the sale *à rémére* of this slave; inasmuch as he imprudently trusted his vendor with the possession of the slave, and allowed him, on a previous occasion, to take him to Texas, where he pledged the slave for the security of money borrowed.

We have further to observe, upon the objections made to *Richard Harper's* evidence, that we take judicial knowledge that slaves are personal property in Texas. Indeed, the sort of title to the slave *Charles*, which *Richard Harper* proves, could only be proved by parol in Louisiana. He swears that the said boy was born and raised his own slave, and that he never parted with the title to him until he made the bill of sale of him to *Dr. McKeon* of Galveston.

The depositions of *McKeon* and of *Richard Harper*, which come up with the bill of exceptions, and the exhibits annexed to those depositions, completely make out the defendants' case.

In dismissing the defendants from this action, we are not to be understood, however, as concluding plaintiff in relation to the title to the slave *Charles*. We do not consider that the proper parties are before us for such a purpose.

It is therefore adjudged and decreed, that the judgment of the District Court be reversed; and that there be judgment in favor of defendants, with costs in both courts.