### AT

# ALEXANDRIA.

### AUGUST, 1858.

### PRESENT:

Hon. A. M. BUCHANAN,  
Hon. H. M. SPOFFORD,   } *Associate Justices.*  
Hon. J. L. COLE.

---

### ANTOINETTE BOULARD *v.* MEREDITH CALHOUN.

| 13 | 445 |
| 107 | 69 |
| 13 | 445 |
| 116 | 384 |

An employer is not responsible for acts of his overseer, which are not done in discharge of duties for which such overseer was engaged ; nor is he responsible for the acts of his slaves used by his overseer, to assist him in the performance of such unauthorized acts.

In a suit brought by plaintiff to recover damages against a planter for the violent ejection of herself from her house, the removal of her goods, wares, and merchandize from her store, and the destruction of the store itself by defendant's overseer and slaves—*Held :* That testimony going to show that the business carried on by plaintiff consisted chiefly in illegal traffic with slaves, was admissible to rebut the claim for damages.

The owner of a slave is not liable for exemplary damages for any offence, or quasi offence, of his slave, unless the slave, in committing the offence, acted under the command of his master, who thereby became an active participant in the tort or crime done.

APPEAL from the District Court of the Parish of Rapides, *Cullom, J. Hyman & Cazabat* and *W. B. Lewis,* for plaintiff. *T. C. Manning, J. H. Overton* and *Ogden & Ryan,* for defendant and appellant.

BUCHANAN, J. This is an action sounding in damages for a tort committed by defendant's slaves.

The petition charges, that by the advice and procurement of the defendant, certain white men, named *Murray, Shelton, Johnson, Hamilton* and *Houton,* together with about twenty-nine slaves, all belonging to defendant, and of which slaves nine were designated by name, came to the residence of plaintiff, in the night of the 19th May, 1856, and forcibly and violently ejected her from her house, and removed her stock of goods, wares and merchandize, from a store which she kept there ; which, together with the person of plaintiff, the said white men and slaves placed in a flatboat, and turned the same adrift in the Red River.

BOULARD
v.
CALHOUN

Petitioner further alleges, that she had in her house two thousand dollars in cash, which the said white men and slaves took possession of, and have never returned to plaintiff; and further, that the said white men and the said slaves, acting by the advice of the said *Meredith Calhoun*, did set fire to plaintiff's house, and consumed the same, with its furniture. The plaintiff lays her damages at twenty thousand dollars.

The case has been before two juries. The first time there was a mis-trial; and the second jury has returned a verdict of five thousand dollars; from which defendant appeals.

The evidence shows that plaintiff resided and kept a small assortment of groceries, dry goods, etc., in a shanty, of the meanest description, which her husband had put up many years ago upon the river bank, on land of the estate of *Hickman*, and for which he, and his widow after his death, covenanted to pay the proprietor of the land an annual rent of five dollars.

The defendant is a planter, having four cotton plantations, lying contiguous to each other, on the opposite side of the Red River from the plaintiff, and all fronting the river. Although the defendant himself resided on one of these plantations, they were all under the superintendence of a general manager, *Mr. Benjamin*; and each of the plantations was provided with a separate overseer.

For reasons which will be seen, when we come to examine a bill of exceptions in the cause, *Dr. Murray*, a planter, living immediately contiguous to plaintiff, and *Mr. Benjamin*, the manager of the defendant, determined to remove the plaintiff and her stock of goods from the shanty which she occupied, and after shipping her and them on board a flatboat, to demolish the shanty itself. This project was executed in the night of the 19th May, 1856. The parties present and aiding in its execution were four in number, namely: *Dr. Murray, Johnson* and *Swim*, two of the defendant's overseers, and *Hamilton*, a herdsman, or *cattle-minder*, in the employ of defendant. The two overseers brought with them, by directions of *Benjamin*, a force of ten each of the slaves attached to the plantations of defendant, under their charge, to do the laboring work of the removal of plaintiff's goods from the shanty to the flatboat. There is no proof whatever that any money of plaintiff was taken, as alleged in the petition.

The first question that we have thought proper to be examined, is one of fact. Was it by the advice and procurement of the defendant that the acts just detailed were committed?

It is certain that the defendant was not present in person at the scene of the outrage. The plaintiff's petition declares that he was not present, by enumerating those who were present. It is true that two witnesses of plaintiff, *Mrs. Hamilton* and *Mrs. Shelton*, declare that he was present; but their evidence is very satisfactorily shown to be false in this particular. And it is proved, by two witnesses, that the defendant, so far from advising the invasion of plaintiff's rights of property and the violence to her person, on this occasion, distinctly refused to give them his sanction, when applied to for that purpose. *Mr. Benjamin* says: "I was present when *Dr. Murray* proposed to defendant to remove plaintiff forcibly, and his reply was, that the act would be outrageous and illegal, and that he would have nothing to do with it." And *Johnson*, in giving an account of the arrangements between himself and *Benjamin*, for the foray upon the plaintiff, tells us that *Benjamin* enjoined him "not to say any thing to defendant about it." *Swim*, the other overseer concerned in this affair, says: "He never had any conversation with defendant about this transaction previous to its occurrence." *Dr. Mur-*

*ray* says : "The first proposition for the removal of plaintiff was first talked of at defendant's, between *Mr. Benjamin* and witness, either by boxing up her goods and by hauling them off, or by putting them in a flatboat. Defendant was afterwards sent for by witness and *Benjamin,* and consulted in the matter. * * * * * Defendant said in substance that he would have nothing to do with her forcible removal ; that he had prosecuted her in Natchitoches, and would probably get her off in that way. Thinks he made a statement to the effect that she was a woman, and he would not resort to any violent means of removal." Again, in evidence taken under commission, *Dr. Murray* says : "After *Mr. Calhoun* refused to participate in the removal of plaintiff, he immediately left the company and went to his own room ; that the way *Mr. Calhoun* had come into the room was, that *Mr. Benjamin* and witness had sent for him. The conversation was still continued after *Mr. Calhoun* had left the room ; that *Mr. Calhoun,* as witness had already stated, refused to have any thing to do in the transaction, but did not peremptorily forbid any others from proceeding in the matter at that time."

We consider, therefore, that the plaintiff has failed to prove the allegation of her petition, that the tort complained of was perpetrated by the advice and procurement of defendant ; but, on the contrary, it is proved that it was not by his advice and procurement.

Conceding that, under Art. 180 of the Civil Code, the master is answerable for all the damages occasioned by an offence or quasi-offence committed by his slave ; and that this liability attaches, as decided in the case of *Collingsworth* v. *Covington,* 2 An. 406, whether the owner could have prevented the damage complained of, or not ; we are next to enquire what pecuniary loss the plaintiff is proved to have sustained by the acts of defendant's slaves in the premises. Those acts consisted in removing the plaintiff's property from her house to the flatboat ; and in destroying her house by fire. Those were acts committed under the orders of defendant's overseers, who were persons set over the slaves by their master, and to whose orders they were accustomed, as well as obliged, to yield obedience. We should, therefore, not consider these acts, under the circumstances, as acts of the slaves themselves, properly speaking, but rather as acts of the overseers, for which defendant is not bound, because they were not acts done in the discharge of the duties for which those overseers were engaged. (C. C. 2299.) But defendant had notice from *Benjamin* and *Murray,* of what was in contemplation ; and, although he disapproved of it, and although it is not proved that he had any notice of the intention of his manager, to employ any of his slaves in the execution of the project, yet we think that, having such notice, he ought to have, in the words of *Murray,* "peremptorily forbidden" the taking of his slaves for any such purpose ; and not having done so, he is responsible for the acts above enumerated as acts committed by his slaves.

We are next to enquire, what is the legal extent of such responsibility ? By Article 180 of the Code, the master is answerable for all the damages occasioned by an offence or quasi-offence committed by his slave. (Les maîtres seront tenus de réparer les dommages causés, etc.) We find nothing in the terms of this Article, or of the following one, which extends the doctrine of exemplary, vindictive, or punitory damages, to this class of responsibilities ; with the single exception of the case where the tortious or criminal act has been committed by the slave, by the express command of his master. In which case we may perhaps imply the doctrine from the terms of Article 181 ; and from the consideration that, in the

case mentioned, the act of the slave would be, in reality, the act of the master; and the slave merely a tool in the hands of the master.

But to extend an accountability so indefinite as that for vindictive damages, to other cases than those in which the owner of the slave was an active participant in the tort or crime committed by the latter, would constantly expose the master to ruin by the acts of a vicious slave, without any fault of his own; and would thereby operate as the greatest of discouragements, to the holding of that species of property; a consequence which we conceive to be at variance with the policy of the law of Louisiana.

None of the witnesses estimate the actual loss sustained by the plaintiff at more than one thousand dollars; a lumping estimate, with very imperfect data to support it. It is proved, that in fifteen days after this event, the plaintiff was re-established at her old stand, with all her furniture, stock of goods, etc., about her, just as they were before the fire.

There is a bill of exceptions in the record, to the refusal of the district court to permit the defendant to offer, in mitigation of damages, proof of the nature and character of the business carried on by plaintiff; that it consisted chiefly of illegal trafficking with slaves. Much evidence of this kind, contained in depositions, was ruled out by the district court; but comes up in the record, marked with cross lines, or enclosed in brackets. We are of opinion that this evidence should have been admitted, to rebut the claim of exemplary damages. The mischiefs to our agricultural population, arising from shops kept by unprincipled white people, where whiskey is furnished to slaves in exchange for articles pilfered from their masters, have been frequently the object of legislative attention. Such traffic is prohibited under very stringent penalties; and in some of these statutes, rules of evidence, highly favorable to the prosecution, have evinced the legislative sense of the importance of repression, and of the difficulty of conviction. The nature of the traffic, almost exclusively nocturnal, with parties incompetent as witnesses, makes it peculiarly hard of detection.

Having before us in the record this excluded testimony, which we think should have been admitted, it is unnecessary to remand the cause on that account. We have examined it, and find that it contains abundant proof that the plaintiff was habitually, and notoriously engaged in an illegal traffic with slaves.

Parties should present themselves in court with clean hands; and one, who appears as a suppliant to the justice of her country, for enormous vindictive damages, based upon a violation of sacred rights, guaranteed to her by the constitution and laws of the land, should take heed that no habitual violation of those laws on her own part, has made her a nuisance to the community in which she resides.

It is, therefore, adjudged and decreed, that the judgment of the district court be reversed, and that plaintiff recover of defendant one thousand dollars, with costs of the court below; those of appeal to be paid by the appellee.

COLE, J., concurring. Inasmuch as plaintiff sought to recover, not only actual damages, but also smart money, I am of opinion defendant was entitled to introduce testimony relative to the character and occupation of plaintiff, in mitigation of the exemplary damages.

The philosophy of punitory damages is based upon the effect of the unlawful act, in outraging the feelings of the sufferer; and also upon the justice and necessity of punishing beyond real damage to the person or property, him who has molested, and injured one pursuing avocations not reprobated by the State, or performing all the obligations of good citizens, and, therefore, specially under the protection of the law.

All rules of law ought to be established upon equitable principles.

There would be neither reason nor common sense in allowing the same amount of exemplary damages for a tort against one whose illegal acts were its exciting cause, as against a good citizen.

If injury to the feelings be considered in estimating the damages, then the sentiments and delicacy of the hardened violator of the law, are not to be valued at the same rate as those of the citizen who obeys the laws of his country. I concur in the opinion of Mr. Justice Buchanan.

SPOFFORD, J., concurring. Whatever may be the doctrine concerning " exemplary damages," in cases against the wrong-doer himself, I think it clear that *smart money*, as it is termed, (that is, *punitory*, as distinguished from *compensatory* damages,) cannot be levied upon a master for the act of his slave, to which he was not privy.

The evidence fails to satisfy my mind that *Calhoun* was privy to the acts of his slaves, done to the injury of plaintiff; and his overseers were not acting in the scope of their employment.

One thousand dollars appear, from the testimony, to be an ample allowance to cover the real, or actual damages suffered by the plaintiff.

I am, therefore, able to concur in the decree, without expressing an opinion upon the admissibility of the evidence offered, to show the plaintiff's habitual business and character.