193 So.2d 330 (1966)
Howard HERBERT
v.
TRAVELERS INDEMNITY COMPANY et al.
No. 2362.
Court of Appeal of Louisiana, Fourth Circuit.
December 5, 1966.
Rehearing Denied January 9, 1967.
Writ Refused March 10, 1967.
*331 Krieger, Krieger & Tracy, I. J. Krieger and Robert K. Tracy, New Orleans, Nichols, Gaither, Beckham, Colson, Spence & Hicks, Miami, Fla., for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Ernest A. Carrere, Jr., and Ashton R. Hardy, New Orleans, for The Travelers Indemnity Co., Anesthesia Associates, and Dr. Byron J. Casey, defendants-appellees.
Loeb & Livaudais, Marcel Livaudais, Jr., New Orleans, for Dr. Francis N. Vallette and Hartford Accident and Indemnity Co., defendants-appellees.
*332 Porteous & Johnson, William A. Porteous, Jr., and C. Gordon Johnson, Jr., New Orleans, for Southern Baptist Hospital, Inc., and Underwriters at Lloyd's, defendants-appellees.
Dufour, Levy, Marx & Lucas, Leonard B. Levy, New Orleans, for General Accident Fire and Life Assurance Corp., Ltd., and Dr. Warren Hebert, defendants-appellees.
Before McBRIDE, JANVIER and BARNETTE, JJ.
BARNETTE, Judge.
This is an appeal by the plaintiff from a judgment based on a jury verdict rejecting his demand for damages for alleged negligent injury in the administration of a spinal anesthetic.
The plaintiff, Howard Herbert, consulted Dr. Warren Hebert about a hemorrhoid condition, and, after two cancellations of scheduled surgical operations, a hemorrhoidectomy was scheduled at Southern Baptist Hospital in New Orleans for July 5, 1962. In preparation for the operation, plaintiff was admitted to the hospital on July 4, and that evening was visited by Dr. Nicholas Montalbano, a partner of defendant Dr. Byron Casey in Anesthesia Associates. Dr. Montalbano advised him that a spinal anesthetic would be used, as is common in hemorrhoidectomies. Plaintiff made no objection to its use in his operation.
On July 5, after preparation for the surgical procedure which included the administration of drugs for sedation, plaintiff was taken to the operating room and placed on the operating table. Dr. Hebert, who was out of the city, had arranged for his partner or associate, Dr. F. N. Vallette, to perform the hemorrhoidectomy. Dr. Vallette was preparing for the operation in another room when plaintiff was brought in and placed in charge of Dr. Casey, the anesthesiologist.
Plaintiff was placed on the table in a "buoy" position, which is accomplished by breaking the table in the middle so as to form an inverted V-shape and placing the patient with his lumbar region over the apex of the table and with his head and feet extending downward. The purpose of this procedure is to put the rectum in proper position for the hemorrhoidectomy and also to spread the vertebral interspaces to facilitate the introduction of the spinal needle. While the patient was in this position, Dr. Casey injected a local anesthetic preparatory to the insertion of the spinal needle. He then located the interspace between the third and fourth lumbar vertebrae by feeling and inserted the needle at that level. When the point of the needle punctured the dura and entered the spinal canal, plaintiff gave out a cry of intense pain and complained that his left leg felt like it had been subjected to a severe electrical shock. The medical experts are in agreement that the severe pain and sensation of electric shock resulted from the spinal needle coming into contact with a nerve root.
These nerve roots are called the cauda equina because of their similarity to a horse's tail. They were described by Dr. John Adriani as nerves which hang down and float in the spinal fluid very much like spaghetti would float in a bowl of soup. They are free to move, and it is not uncommon in giving spinal anesthetic or making a spinal tap that the needle comes into contact with them. It is more likely that the needle will push them aside than pierce them.
Because of plaintiff's intense pain and restlessness, he was given a shot of a pain relieving drug in the hand by a nurse or an assistant of Dr. Casey. Dr. Casey admitted that Nembutol was given, but after he had completed the spinal anesthesia. At any rate, plaintiff was rendered unconscious.
Dr. Vallette performed the hemorrhoidectomy without further incident, and the patient was returned to his hospital room at about 11:00 A. M. The time consumed *333 from the injection of the spinal anesthetic to the completion of the surgery was about 45 minutes. Plaintiff regained consciousness soon after returning to his room and immediately complained of intense pain in his left leg and was given Dilaudid, a very potent pain killing drug.
Plaintiff continued to complain of pain in his left leg and foot throughout his six days in the hospital. There was no complaint of the hemorrhoidectomy, which plaintiff acknowledged to have been entirely satisfactory.
During his postoperative stay in the hospital, plaintiff was seen by Dr. Hebert, who returned to the city on July 7, and also by Dr. Vallette. Dr. Casey, the anesthesiologist, left the city the day following the operation, and in his absence plaintiff was visited by Dr. Montalbano and Dr. William K. Taylor, another partner of Dr. Casey in Anesthesia Associates. Drs. Montalbano and Taylor were concerned about the persistent leg pains and arranged for an examination by Dr. Richard M. Paddison, a neurologist, at the expense of Anesthesia Associates. On August 7, 1962, Dr. Paddison wrote to Dr. Taylor giving a report of his examination.
After examination and diagnosis by Dr. Paddison, plaintiff was put under the care of Dr. Solomon Winokur who gave him a total of 150 physiotherapy treatments.
After plaintiff engaged attorneys to represent him, arrangements were made for him to be examined by Dr. Richard W. Levy, a local neurosurgeon, and later by Dr. H. Harvey Gass, a neurosurgeon in Detroit, Michigan. The findings and testimony of all these physicians will be discussed below.
Plaintiff brought suit for damages alleging a permanent injury, pain and suffering, and special damages. He based his suit on the alleged negligence of Dr. Casey, the anesthesiologist, whose alleged fault was the sticking of the spinal needle into a nerve root and injecting a highly toxic drug known as Pontocaine directly into the nerve root. His suit was directed against Dr. Casey, Anesthesia Associates and their insurer, Dr. Hebert, Dr. Vallette, and Southern Baptist Hospital and their respective insurers, charging them as joint tort-feasors. The alleged bases for the liability of the surgeons and the hospital is best summed up in plaintiff's brief in the following words:
"The record will show that the plaintiff's complaint against the Southern Baptist Hospital and its insurer is based on the fact that the anesthesiologist did all of his work at the hospital under the rules of the hospital, and that if there is negligence on the part of the anesthesiologist, Dr. Casey, then under the theory of agency and the furnishings of a service by the hospital, the hospital is responsible.
"As to Dr. F. N. Vallette and his insurer, he was the surgeon and he picked the anesthesiologist, and he was the `captain of the ship' insofar as the operation and the control of the operating room itself is concerned and consequently he is responsible for any negligent act on the part of the anesthesiologist, Dr. Casey.
"As the employer of Dr. Vallette, Dr. Hebert and his insurer is therefore liable to the plaintiff under the doctrine of respondeat superior." (Emphasis in the original.)
The record fails to disclose any legal basis whatever for plaintiff's suit against the surgeons and the hospital and their respective insurers, and we need not discuss their alternative third-party petitions. In fact plaintiff does not seriously argue this issue, and it is unnecessary to discuss it further. If there was any fault or negligence in the administration of the spinal anesthetic, it was that of Dr. Casey, who, as an independent specialisit, was wholly responsible for the instruments used; the method employed; and the professional judgment, technique, and skill applied in the giving of the spinal anesthetic.
*334 As stated above, plaintiff bases his claim on the alleged negligence of Dr. Casey in injecting the anesthetic drug directly into a nerve root. Counsel for Dr. Casey argues that the only issue is whether or not his client met the standard of care required of him as enunciated in Meyer v. St. Paul-Mercury Indem. Co., 225 La. 618, 634, 73 So. 2d 781, 786 (1954):
"* * * the law only exacts of physicians, surgeons and dentists that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them. * * *"
But the question is not that simple. The application of this test does not provide the answer to the crucial issue, namely, did Dr. Casey inject the anesthesia directly into the nerve root?
If the testimony supports an affirmative answer to the foregoing question, the burden then shifts to Dr. Casey to exculpate himself; because all the medical experts who appeared in this case, including Dr. Casey himself, testified to the effect that it is contrary to the professional standards in this community or anywhere else to inject spinal anesthesia directly into the nerve rootsthat it is never knowingly done. The object is to inject the anesthetic drug into the fluid in the spinal canal and "bathe" the nerve roots in the anesthetizing solution.
Since the injection of an anesthetic agent directly into the nerve root is not in accordance with accepted professional standards in the community, then it follows logically that, if it was done, it was done accidentally or in deviation from accepted standards. This would then properly call for the application of the doctrine of res ipsa loquitur. As this court stated in its opinion in Meyer v. St. Paul-Mercury Indem. Co., 61 So.2d 901, 905 (1952):
"We have no doubt at all that the doctrine of res ipsa loquitur has no application where, in the ordinary suit against a physician, a surgeon, or a dentist for malpractice, all that is shown is that the desired result was not accomplished. On the other hand, however, we think that where the complaint is not based on the failure to obtain satisfactory results, but is based on the charge that, during the rendering of the professional services, there occurred some untoward event, or some omission or act from which there resulted something not ordinarily found to result during such treatment or operation, the physician, or the surgeon, or the dentist may be required to show that such unusual occurrence did not result from negligence on his part."
Although there was a sharp difference of opinion among the Justices of the Supreme Court on the basic issue of negligence when they reviewed the Meyer case, all of the Justices who expressed an opinion agreed that the doctrine of res ipsa loquitur was applicable when an untoward event occurred. See also Jacobs v. Beck, 141 So. 2d 920 (La.App. 4th Cir. 1962); Andrepont v. Ochsner, 84 So.2d 63 (La.App. Orleans 1955); Thomas v. Lobrano, 76 So. 2d 599 (La.App. 2d Cir. 1954).
For proof that the anesthesia was injected directly into a nerve root, plaintiff relied primarily on the testimony of Dr. Paddison, Dr. Levy and Dr. Gass. All of these doctors were eminently qualified to testify as experts in the field of neurosurgery. Dr. Paddison, in his letter of August 7, 1962, to Dr. Taylor expressed the following opinion:
"I feel that this patient probably has a neuritis of the 5th lumbar and 1st sacral roots, probably as the result of the chemical injection and spinal anesthetic agent being injected directly into a root."
*335 On trial below he defended the opinion expressed in the letter of August 7, although he apparently was placed in the uncomfortable position of giving testimony against the interest of his professional associates for whom and at whose expense he had examined the plaintiff.
Dr. Levy, who saw plaintiff on March 3, 1964, and October 20, 1965, went into detail in relating his examination of plaintiff, and when asked by counsel if he had an impression or diagnosis, he answered affirmatively and said:
"A From the history, he had received a spinal anaesthetic for a hemorrhoidectomy in July of 1962, and reported to me that he had had pain in the left leg, with numbness in the left leg since that time. It was my belief he had sustained a traumatic neuropathy, which means an injury to the left fifth lumbar, and first sacral nerve roots, secondary to the spinal anaesthetic of July of 1962."
Then, after objections against speculative opinion and instructions from the court, Dr. Levy said:
"A Well, there are three alternatives that I can think of. I don't think this is speculative. One is the nerve roots may have been damaged by the introduction of the needle, the needle having struck the nerve root, and physical contact with the needle having caused the damage. The second is that the medicine which was used for the spinal anaesthetic was injected, perhaps into the sheath, the covering, because each one of these has a covering and that may have caused the damage. The third is that the spinal anaesthetic substance simply affected these two nerve roots differently than the remainder of the nerve roots. That is to say a chemical reaction occurring to the nerve roots, the fifth lumbar and the first sacral nerve roots. There may be other things that could have caused it."
In further testimony Dr. Levy indicated that in his opinion the second alternative was the most likely cause of the injury.
The other medical expert on whom plaintiff strongly relies is Dr. Gass, whose testimony was given by deposition. It was read to the jury with objections and rulings from the court on admissibility of certain portions. Dr. Gass testified in some detail about the tests made in the course of his examination and stated that his preliminary diagnosis entertained three possibilities: (1) radiculitis, an inflammation of a nerve root or the consequences thereof; (2) causalgia, which is manifested by a burning type of pain and other symptoms, usually resulting from an injury to a peripheral nerve; and (3) arachnoiditis, an inflammation of the arachnoid, which is the thin membranous tissue surrounding the nerve roots and fluid in the spinal canal. X rays were taken, a myelogram test performed, and a sympathetic nerve block done under Dr. Gass' direction. All these were negative or within normal limits, which, according to Dr. Gass, were indications against arachnoiditis and causalgia, leaving radiculitis as the most probably correct diagnosis.
At this point a long hypothetical case situation was given to Dr. Gass covering in detail and in chronological order the facts concerning plaintiff's entry into the hospital, the administration of anesthetic, the surgical operation, postsurgical treatment, complaints and symptoms up to and including Dr. Gass' examination. The court sustained objections to the question and the doctor's answer saying: "One of the reasons of ruling it out is that the facts given to the doctor do not coincide with the facts brought out on trial." The question and answer did not go to the jury, but was proffered and is in the record before us. Plaintiff has made a vigorous attack on the exclusion of this question and answer and argues that the exclusion denied *336 him the right of a jury determination of the material fact to which it relates.
We have read carefully the hypothetical situation upon which the question is based. It tracks accurately the facts brought out on trial by the other witnesses. The question and answer should have gone to the jury and it was error to exclude them.
After stating the hypothesis, counsel for plaintiff asked Dr. Gass:
"Now, Doctor, assuming that all these facts are true, do you have an opinion as to whether or not there is a causal connection between the spinal administered on Howard Herbert on July the 4th, 1962, at which time he complained of severe pain and the subsequent complaints of Howard Herbert from July the 5th at eleven A.M. in the morning up to the present time?
* * * * * *
"A Yes, I have an opinion.
"Q What is that opinion, Doctor?
"A That the pains that he demonstrates are related to the spinal anesthetic.
"Q What are the reasons for that opinion, Doctor?
* * * * * *
"A His clinical picture as presented to me, the circumstances that initiated, or were associated with initiation of these complaints, my findings, the elimination of one or two other tentative possibilities lead me to a rather clear cut image of what happened.
"Q And what is your clear cut opinion of what happened, Doctor?
"A I think that the needle was inserted into a nerve root and that trauma resulted, and that it resultedthat the trauma resulted either from the needle into the nerve root producing a hemorrhage, or the substance injected into the nerve produced the consequences."
Bearing in mind that the crucial question of fact in this case is whether or not Dr. Casey injected the spinal anesthetic drug, Pontocaine, directly into the nerve root, and considering the expressed opinions of Drs. Paddison and Levy, the foregoing question and answer are very material. Plaintiff contends that had this evidence gone to the jury and had the jury then been properly instructed on the application of the doctrine of res ipsa loquitur, its verdict might have been different.
Dr. Casey did not deny that a nerve root was struck, which all the experts agree cannot always be avoided, and happens in many cases regardless of the skill and care of the physician. He testified that he withdrew the needle slightly and removed the stylus, which is a sword-like instrument placed in the hollow passageway of the spinal needle to prevent its becoming clogged during insertion into the patient. He testified that after removing the stylus, he observed spinal fluid rising in the hollow needle, indicating that its point was unobstructed in the spinal canal and not in a nerve root. The syringe containing the anesthetic drug was then attached and a small amount of spinal fluid was drawn up through the needle, confirming free flow and proper position, after which he injected the Pontocaine.
This court has appellate jurisdiction of both the law and the facts under LSA-Const. Art. 7 § 29, and we have not hesitated in many cases to pass initially on questions of fact in cases where the jury has not done so, or where improper instructions have been given.[1] Whether or not it is our constitutional duty to do so in all cases, or whether it is our duty to remand certain cases for a jury determination of material issues of fact where, because of the erroneous *337 ruling of the trial judge, material evidence bearing upon the fact in question or proper instructions have been withheld from the jury, is the question which has given us much concern in this case.
The right to a trial by jury would seem to imply the right to have all material evidence bearing upon a crucial question of fact to be heard and passed on by a properly instructed jury. To hold otherwise would deny to a party seeking trial by jury a fully effective and meaningful jury determination of the facts in question.
The right to have the jury pass initially on crucial questions of fact is of particular importance to litigants in cases involving close questions of fact because in such cases it is more unlikely that the appellate court will find manifest error in the jury's determination of the fact. Hence, if the jury has not been allowed to pass judgment initially on a crucial fact, and the appellate court undertakes to do so initially, the parties on appeal have been denied the benefit of the manifest error rule.
Here it can be argued that the jury, by finding a verdict for defendants, has passed on the questions of fact against the plaintiff. In extending this argument to its ultimate, we might conceive of a situation where all material evidence on a crucial fact has been excluded and the jury finds a verdict without considering the crucial fact. Can it then be said that the parties have had a jury trial on the material issues?
We think that it is the duty of the appellate court to determine whether the evidence excluded and the instruction refused are of such material or crucial significance as to require a remand in order that the jury might hear and pass on it. Remanding for this purpose should be carefully limited to those cases in which it appears that a verdict for either party would probably be affirmable because of the absence of manifest error. The appellate court should pass judgment on the fact as well as the law when the record before the court is complete and the preponderance of the evidence indicates there is only one conclusion which can be reached reasonably and justly.
There are numerous cases in our jurisprudence where the appellate courts have exercised the discretion vested in them in remanding cases where the ends of justice would best be served by doing so.[2] In many of these cases a word of caution has been sounded to the effect that this discretion should be exercised sparingly and according to the peculiar exigencies of the particular case. The authority for this action prior to the adoption of the Code of Civil Procedure was found in Code of Practice art. 906. The substance of that article was incorporated in LSA-C.C.P. art. 2164. See comments (c) and (d) under Article 2164.
In none of the many cases we have found where this discretion was exercised was the reason for remand the same as that presented here. In most of those cases the record on appeal was incomplete on some significant point, or new or additional evidence was necessary to remove uncertainties of fact. But we think the principle, namely, to best serve the ends of justice, is equally compelling here and our discretion should be exercised accordingly.
Since the right of trial by jury in civil cases is granted by our law, it is the duty of the courts to protect that right and give it meaning and effectiveness. It is our opinion that the plaintiff, who has exercised *338 his right to trial by jury, has been denied substantial justice by denying the jury the benefit of the foregoing excluded material testimony and instruction on res ipsa loquitur. The ends of justice would be served by remanding this case with instructions.
Plaintiff's requested charge on res ipsa loquitur read as follows:
"I charge you that the doctrine of res ipsa loquitur applies in this case against Dr. Byron J. Casey, defendant. This means that the burden is on Dr. Casey who had control of the dangerous instrumentality which caused an accident, to show his freedom from negligence in a case where such accident would not ordinarily have occurred, had proper care and use been made of the instrumentality."
The denial of the charge as thus stated was proper, since it presumes that the factual predicate for application of the doctrine has been clearly established. It would be proper, and the court should instruct the jury that the doctrine applies, but only if the jury should first find as a fact that the plaintiff's alleged injury resulted from Dr. Casey's injecting Pontocaine directly into a nerve root and further find that it would not have occurred except for some negligence or deviation from the standard of professional skill and care exercised by practitioners in the field of anesthesiology in the same locality or community.
The trial court should further instruct the jury that if they find that the Pontocaine was injected directly into the nerve root and that it probably would not have happened but for some fault on the part of Dr. Casey, that they must then evaluate Dr. Casey's testimony and evidence and decide whether or not he has sufficiently explained his conduct to exculpate himself. Dr. Casey testified about what techniques he used and what precautions he took in administering the anesthetic. Dr. Adriani and the other expert anesthesiologists agreed that the procedures described met the standard of care of this community. Thus if a jury reaches the question of whether or not Dr. Casey has exculpated himself, the answer to that question will largely depend on their evaluation of him as a witness.
Plaintiff has assigned as error the court's denial of an equal number of peremptory challenges. It is alleged in plaintiff's brief that the court allowed him 10 peremptory challenges, while allowing the defendants a total of 40. Counsel for Dr. Casey alleged in his brief that the plaintiff had not been prejudiced since he had not used all of his 10 challenges and Dr. Casey had used only one. The record before us contains no minute entry or other information from which we can determine the number of challenges allowed each side or the number used. We must assume that the court followed, and will follow on remand, the clear and unequivocal provisions of LSA-C.C.P. art. 1764 in allowing peremptory challenges.
The other assigned errors are either without merit or have become moot by the effect of this opinion.
For the foregoing reasons, the judgment in favor of defendants Dr. Warren Hebert, Dr. F. N. Vallette, Southern Baptist Hospital, Hartford Accident & Indemnity Company, General Accident Fire and Life Assurance Corporation, Ltd., and Underwriters at Lloyds and against the plaintiff, Howard Herbert, dismissing plaintiff's demands against them at his costs, is affirmed. The judgment in favor of defendants Dr. Byron J. Casey, Anesthesia Associates, and Travelers Indemnity Company against plaintiff, Howard Herbert, dismissing plaintiff's suit is set aside; and the case remanded for new trial against those defendants in accordance with the views herein expressed.
Assessment of costs shall await final judgment.
*339 Affirmed in part; judgment set aside in part and remanded.
McBRIDE, Judge (concurring in part and dissenting in part).
I concur in the affirmance of the judgment below insofar as it dismisses plaintiff's demands against the defendants named in the first paragraph of the decree, and I approve of the majority's reasons for such affirmance
But I respectfully dissent from the setting aside of the judgment, insofar as it runs in favor of Dr. Byron J. Casey, Anesthesia Associates, and Travelers Indemnity Company against plaintiff, and the remanding of plaintiff's claims against said defendants for a new jury trial.
The trial judge erred in not permitting the questioned portion of Dr. Gass' depositions to be read to the jury, but in my opinion, in view of our prerogatives and duties defined by law, the exclusion of said evidence did not amount to prejudicial error as against plaintiff. Under Art. 7, § 29, Const.1921, courts of appeal have appellate jurisdiction of both the law and the facts and under C.C.P. art. 2164, the appellate court shall render any judgment which is just, legal and proper upon the record on appeal. The testimony in question, although it never reached the jury, is before us and the record of appeal is replete with all evidence adduced by the parties. This being so, I cannot conceive of any reason why there should be a remand of the case. Whereas, the demands of plaintiff as against Dr. Casey, Anesthesia Associates, and their insurer can be adjudicated on the record as presently made up, a remand of the cause will amount to but an idle ceremony merely serving to delay justice and provoke a circuity of proceedings. An appeal will undoubtedly ensue regardless of the judgment rendered below after another jury has passed on the questioned testimony and the record of appeal will contain the same evidence as that before us at the present time. Why cannot this court just as well review and adjudicate the case now?
Where evidence improperly excluded is in the record, it will be considered, and the case will not be remanded. Lenehan v. Gulf Land & Lumber Co., 118 La. 217, 42 So. 780; Finley v. Bogan, 20 La.Ann. 443; J. M. Beebe & Co. v. Kaiser & Bryan, 19 La. Ann. 270; Wood v. Harrell, 14 La.Ann. 61; Boulard v. Calhoun, 13 La.Ann. 445; Elliott v. Steamboat James Robb, 12 La. Ann. 12; Farwell v. Harris, 12 La.Ann. 50; Trimmel v. Marvel, 11 La.Ann. 404.
No jury trials were involved in the cited cases but the principle of law enunciated by the Supreme Court would apply as well where the case was tried before a jury. In the matter of jury trials the full jurisdiction of an appellate court over the law and the facts enables the court to take the case as established by the evidence in the record and to apply the law accordingly regardless of any procedural errors which might have been committed below. Peeples v. Dobson, Maryland Cas. Co., La.App., 99 So.2d 161 (cert. den.); Duet v. Montagnet, La.App., 169 So.2d 561.
I could never subscribe to the intimation of the majority that because the questioned evidence was not read to the jury that plaintiff's chances of success on this appeal have somehow been jeopardized.
My humble thought is that the court should proceed with an adjudication of the appeal on the record as now constituted.
NOTES
[1] LaHitte v. Acme Refrigeration Supplies, Inc., 192 So.2d 172 (La.App.1966); Barreca v. United States Fire Ins. Co., 182 So.2d 138 (La.App.1966); Dowling v. Mutual Life Ins. Co., 168 So.2d 107 (La. App.1964).
[2] Bartolotta v. Gambino, 78 So.2d 208 (La.App. Orleans 1955); Johnson v. Sandifer, 56 So.2d 762 (La.App.2d Cir. 1952); Weil v. Eastern Air Lines, Inc., 52 So.2d 777 (La.App. Orleans 1951); Gabriel v. United Theatres, Inc., 50 So. 2d 514 (La.App. Orleans 1951); Aetna Finance Co. v. Betz, 35 So.2d 909 (La. App. Orleans 1948); Southern Hardware Co. v. Barham, 180 So. 156 (La.App.2d Cir. 1938).